ARTISAN & TRUCKERS CASUALTY CO. and
Progressive Casualty Insurance Company,
Plaintiffs-Respondents,†

v.

John THORSON, Maria Thorson, Sandra L. Anson
and Westport Insurance Corporation,
Defendants-Appellants.

Court of Appeals

*No. 2011AP2. Submitted on briefs October 7, 2011.
—Decided January 18, 2012.*

2012 WI App 17

(Also reported in 810 N.W.2d 825.)

† Petition for Review Filed.

346

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Daniel C. Conway* of *Jacobson Legal Group, S.C.*, Brookfield.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Thomas M. Devine* of *Hostak, Henzl & Bichler, S.C.*, Racine.

348

Before Brown, C.J., Reilly, J., and Neal Nettesheim, Reserve Judge.

¶ 1. REILLY, J. John Thorson carried primary and umbrella insurance policies with Progressive Casualty Insurance Co. A month before his umbrella policy was to expire, Progressive notified Thorson that he would not receive an offer to renew his existing umbrella policy because Progressive was making an administrative change and would instead issue the umbrella policy with Artisan & Truckers Casualty Co., a company also owned by Progressive. Progressive told Thorson that he did not have to do anything because of the administrative change. Progressive also told Thorson that his current umbrella policy did not provide uninsured/underinsured motorist (UM/UIM) coverage and that he could purchase $500,000 of UM/UIM coverage. Thorson was told to contact his Progressive agent for service.

¶ 2. Thorson contacted his agent, Sandra Anson, and purchased $500,000 of UM/UIM coverage. Anson received confirmation from Progressive of the purchase. Thorson inquired as to when he was to pay the premium and he was told to wait for a bill.

¶ 3. Ten days later, Thorson's daughter was seriously injured in a car accident caused by an uninsured motorist. Upon notice of the accident, Progressive and Artisan issued the umbrella policy with $500,000 of UM/UIM coverage but with an effective date that was two days after the accident and eleven days after Progressive had confirmed the additional coverage.

¶ 4. Progressive and Artisan filed a declaratory judgment action asserting that there was no coverage for the injuries sustained by Thorson's daughter as Thorson's policy had lapsed for nonpayment. Thorson

counterclaimed for breach of contract and failure to timely pay a claim, and cross-claimed against Anson for negligence and misrepresentation. Anson counterclaimed against Progressive and Artisan to reform the umbrella policy to provide UM/UIM coverage to Thorson, arguing that Progressive had confirmed Thorson's UM/UIM coverage under the umbrella policy prior to the accident and that Anson had express authority to bind coverage pursuant to its "producer's agreement." Anson requested indemnification from Progressive pursuant to the producer's agreement.

¶ 5. The circuit court dismissed Thorson's claims against Progressive, ruling that the umbrella policy was not in effect at the time of the accident and that Thorson was not renewing an existing policy but applying for a new policy. Thorson and Anson thereafter settled.[1] Progressive then moved for and was granted summary judgment against Anson based on the election of remedies doctrine. Thorson and Anson appeal.

¶ 6. We reverse. We hold that Progressive was bound by its own actions as well as the actions of Anson, and that the election of remedies doctrine does not apply under the facts of this case.

## BACKGROUND

¶ 7. John Thorson's primary policy with Progressive provided $250,000 of UM/UIM coverage while his umbrella policy provided $1 million of coverage but did not provide UM/UIM coverage. On September 20, 2008, Progressive wrote to Thorson and informed him that his umbrella policy, numbered 21459542–0, would

---

[1] Thorson, Anson, and Anson's insurer filed an interlocutory appeal from the order for judgment, which we denied.

expire on October 22, 2008, and that he would "not receive an offer to renew" his coverage because:

> There has been an administrative change in the way [Progressive is] delivering policies. Progressive is made up of several different companies and the company that currently provides your insurance, Progressive Casualty Insurance, will no longer be issuing your policy. Your current policy must be nonrenewed so that we can issue you a new policy under Artisan and Truckers Casualty Company.

In a separate letter on the same date, Progressive notified Thorson that:

> We want you to be aware of an administrative change to your policy. Progressive is made up of several different insurance companies, and *we are changing the company that provides your insurance* from Progressive Casualty Insurance Company to Artisan and Truckers Casualty Company. Please know, however that *you don't have to do anything*. Your coverages, services and premiums will be unaffected.
>
> . . . .
>
> We appreciate your trusting us with your insurance needs, and thank you for your patience with this *administrative change*. (Emphasis added.)

¶ 8. Progressive also provided Thorson with a written "Personal Umbrella Insurance Coverage Summary" on September 20, 2008, which stated, "This is your *Renewal* Declarations Page." (Emphasis added.) The notice was from Progressive, but listed Artisan as the underwriter. Although Progressive stated in its September 20, 2008 letter that Thorson would "not receive an offer to renew," Progressive sent a "renewal bill" to Thorson on the same date. Neither Progressive nor Artisan required Thorson to apply for insurance

with Artisan. The "renewal bill" received by Thorson stated that the policy was underwritten by Artisan as policy number 21459542-1. "Progressive" appears at the top of the renewal bill, just as it appeared on all of the correspondence that related to either Progressive or Artisan.

¶ 9. Progressive also notified Thorson on September 20, 2008, that while his current umbrella policy did not provide UM/UIM coverage, he could purchase $500,000 or $1 million of UM/UIM coverage. Thorson was instructed to contact his Progressive insurance agent for service.

¶ 10. Thorson contacted his Progressive agent, Anson, to inquire about the cost of adding UM/UIM coverage to his umbrella policy. Anson was employed through Diversified Insurance Service, an agency that sells Progressive policies. Anson was unaware that Thorson's umbrella policy with Progressive was being reissued under Artisan, as Progressive had not notified Anson of the administrative change in companies. Anson contacted Progressive about adding UM/UIM coverage and obtained quotes for coverage levels of $500,000 and $1 million. Progressive provided Anson with the quotes on October 13, 2008, and Anson gave the quotes to Thorson. Thorson agreed to purchase $500,000 of UM/UIM coverage on October 13, 2008, and Anson told him the coverage would be effective on the renewal date of October 22, 2008. When Thorson asked how he should pay, Anson told him to wait for a new invoice.

¶ 11. Anson contacted Progressive on October 14, 2008, and informed Progressive that Thorson purchased $500,000 of UM/UIM coverage effective October 22, 2008. Progressive confirmed that the policy was in force and the UM/UIM coverage was added.

¶ 12. On October 23, 2008, Thorson's daughter Maria—a named insured under the policy—was seriously injured in a car accident caused by an uninsured motorist. Thorson called Anson the next day to report the accident and to pay his UM/UIM umbrella premium, even though he had not received an invoice. Progressive and Artisan issued the umbrella policy with UM/UIM coverage on October 25, 2008, with an effective date of October 25, 2008.

¶ 13. Following the circuit court's dismissal of Thorson's counterclaims, Thorson reached a settlement with Anson whereby Anson's insurer paid Thorson $500,000 in return for an assignment of all of Thorson's claims against Progressive and Artisan, and for a release of Thorson's claims against Anson. Progressive thereafter moved for summary judgment against Anson based on the election of remedies doctrine, which the circuit court granted. Thorson, Anson, and Anson's insurer appeal.

## STANDARD OF REVIEW

¶ 14. The interpretation of an insurance contract is a question of law that we review de novo. *Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150.

## DISCUSSION

*Did the Progressive Umbrella Policy Provide UM/UIM Coverage on October 23, 2008?*

¶ 15. The circuit court ruled that the umbrella policy could not be reformed as it was not in effect on October 23, 2008, because Thorson had not paid the

premium. The court also found that Thorson was not renewing his policy but rather applying for a new policy. We disagree.

¶ 16. We first note that Progressive was bound by its own actions, as well as the actions of its agent, Anson. The producer's agreement between Anson's agency and Progressive states that Anson is authorized to "bind coverage" for umbrella policies. Progressive notified Thorson that he could purchase $500,000 or $1 million of UM/UIM coverage for his umbrella policy, and directed him to contact his agent "for personalized service." Thorson did exactly what Progressive suggested and contacted Anson. Thorson purchased $500,000 of UM/UIM coverage for his umbrella policy on October 13, 2008, and Progressive confirmed the $500,000 of UM/UIM coverage with Anson on October 14, 2008. Progressive never conditioned coverage upon payment, as it told Thorson (through Anson) to await an invoice.

¶ 17. WISCONSIN STAT. § 631.09(2) provides:

> **(2)** ACTS OF AGENT. A failure by any policyholder or insured to perform an act required to perfect his or her rights under the policy, or failure to perform the act in the time and manner prescribed, does not affect the insurer's obligations under the policy if the failure was caused by an act, statement or representation or omission to perform a duty by an agent of the insurer who has apparent authority, whether or not the agent was within the actual scope of the agent's authority.

Given the instructions received from Progressive, Thorson was not obligated to pay the extra premium by October 22, 2008. *See* 45 C.J.S. *Insurance* § 882 (2011) (an insurance policy will not be voided for nonpayment when the insurance company's conduct was responsible for the nonpayment).

¶ 18. WISCONSIN STAT. § 628.40 states that "[e]very insurer is bound by any act of its agent performed in this state that is within the scope of the agent's apparent authority." Progressive and Artisan were bound by their confirmation of Thorson's purchase of UM/UIM coverage for his umbrella policy, and by the act of their agent who had the express authority to bind coverage. Thorson was not "applying" for a new policy. Progressive expressly stated that the switch to Artisan was an "administrative change" and that Thorson did not have to do anything. Progressive treated the Artisan policy as a "renewal" of the Progressive policy and never requested nor required Thorson to apply for a new policy.

¶ 19. Thorson acted appropriately at every stage of the process. Thorson first received a "nonrenewal notice" from Progressive informing him that he would not receive an offer to renew because a new company within Progressive would be issuing the policy. Thorson, however, also received a "renewal bill" and a "renewal reminder," which stated that payment was due by October 22, 2008. The original "nonrenewal notice" stated that Thorson should contact his agent. Thorson did as instructed and called Anson to ask for quotes for adding UM/UIM coverage. Anson provided him with the rates, and Thorson agreed to purchase $500,000 of coverage. When he asked how he should pay, Anson told him to wait for an invoice. Anson received confirmation from Progressive prior to October 23, 2008, that the umbrella policy was in force and that the UM/UIM coverage was added. Thorson had not received an invoice from Progressive as of October 23, 2008. As Progressive did not require Thorson to pay the premium on the bound coverage prior to October 22, 2008, we hold that the $500,000 of UM/UIM coverage within the umbrella policy was in force on October 22, 2008.

¶ 20. As we hold that the circuit court erred in dismissing Thorson's and Anson's counterclaims against Progressive and Artisan, we reverse and remand for a new trial on those issues. We also reverse the circuit court's conclusion regarding the election of remedies doctrine. Wisconsin courts do not favor the election of remedies doctrine; it is to be "confined to cases where the plaintiff may be unjustly enriched, where the defendant has been misled, or the result is otherwise inequitable or res judicata applies. The real purpose of the doctrine is to prevent double recovery." *Appleton Chinese Food Serv., Inc. v. Murken Ins., Inc.*, 185 Wis. 2d 791, 807, 519 N.W.2d 674 (Ct. App. 1994) (citations omitted). As a double recovery will not occur given our remand instructions (*see infra* ¶ 30), the doctrine of election of remedies will not apply.

¶ 21. The circuit court relied on *Scheideler v. Smith & Assocs., Inc.*, 206 Wis. 2d 480, 557 N.W.2d 445 (Ct. App. 1996), to conclude that the election of remedies doctrine applied. The Scheidelers insured their vehicles with liability, property damage, medical payments, and UM/UIM coverage for $200,000 with General Casualty through the Smith Agency. *Id.* at 483. When the Scheidelers requested that the Smith Agency remove comprehensive and collision coverage for one of their cars, a Smith employee accidently deleted all coverage *except* comprehensive and collision (i.e., the Scheidelers lost their liability and UM/UIM coverage). *Id.* Rebecca Scheideler was involved in a car accident and the Scheidelers made a claim to General Casualty for UIM benefits. *Id.* General Casualty denied the claim. *Id.* The Scheidelers subsequently sued the Smith

Agency for negligence, and General Casualty for negligence, breach of contract, reformation and bad faith. *Id.* General Casualty and the Smith Agency filed cross-claims against each other for contribution and indemnification. *Id.* at 483–84.

¶ 22. Prior to a scheduled hearing, General Casualty settled with the Scheidelers. *Id.* at 484. The settlement stipulated that the Scheidelers would drop all claims—*save for the bad faith claim*—against General Casualty in return for $200,000 and an assignment of the Scheidelers' claims against the Smith Agency. *Id.* General Casualty then moved for summary judgment against the Smith Agency, raising the negligence claim that the Scheidelers previously alleged and a breach of contract claim which General Casualty sought permission to add. *Id.* at 484–85. The circuit court denied both of General Casualty's claims, ruling that the $200,000 settlement provided the Scheidelers with full relief such that the Scheidelers had no remaining claim against the Smith Agency to assign to General Casualty. *Id.* at 485.

¶ 23. We affirmed. We first noted that an insured has two forms of relief when his or her insurance agent makes a mistake. *Id.* at 486–87. The insured may either sue the insurer for reformation of the policy to correct the mistake, or the insured may sue the insurance agent for negligence and breach of contract. *Id.* While an insured may initially pursue both claims, the insured may not recover against the agent if the insured obtains a judgment against the insurer under the reformed policy. *Id.* at 487. Similarly, if the insured recovers against the agent for failure to procure the requested coverage, the insured may not also recover against the insurer under a reformation of the policy. *Id.*

¶ 24. The Scheidelers settled with General Casualty for the maximum amount of coverage their policy

provided and also retained their bad faith claim. *Id.* at 484, 489. As the settlement payment extinguished the Scheidelers' negligence claim against the Smith Agency (because the settlement equaled the maximum coverage amount), the Scheidelers had no remaining claim to assign to General Casualty and therefore the doctrine of election of remedies was properly applied. *Id.* at 489.

¶ 25. The distinguishing fact of *Scheideler* is that the Scheidelers had no bad faith claim against the Smith Agency. When the Scheidelers settled with General Casualty for the full amount of coverage they were entitled to, they also expressly retained their bad faith claim against General Casualty. The Scheidelers received all the coverage they were entitled to and they also retained their claim for extra-contractual (bad faith) damages. Additionally, General Casualty was not harmed, as it conceded it would have provided the coverage but for the Smith Agency's error. *Id.* at 490.

¶ 26. In contrast, given our holding that coverage was in force on the day of the accident, the circuit court's dismissal of Thorson's and Anson's claims against Progressive had the effect of dismissing Thorson's extra-contractual damages as well as coverage claims. Thorson received his contractual remedies through his settlement with Anson, and thus is not entitled to recover the $500,000 of UM coverage from Progressive. Thorson does, however, retain his claim for extra-contractual damages against Progressive upon remand. Allowing Thorson to pursue his counterclaim against Progressive and Artisan for extra-contractual damages will not unjustly enrich Thorson or result in a double recovery for him, and as such the election of remedies doctrine will not arise upon remand.

358

*Indemnification*

■

¶ 27. We also hold that the election of remedies doctrine does not bar Anson's right to seek contribution or indemnification from Progressive. "Indemnification is a vehicle by which one party or defendant to a lawsuit attempts to shift the entire responsibility for a loss or injury to another party." *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 981 (E.D. Wis. 1999), *aff'd* 241 F.3d 915 (7th Cir. 2001). The rationale behind indemnification is to ensure that the losses are borne by the party responsible for the damages. *See Kutner v. Moore*, 159 Wis. 2d 120, 126, 464 N.W.2d 18 (Ct. App. 1990). The right to indemnification can be either contractual or equitable. *Rich Prods. Corp.*, 66 F. Supp. 2d at 981.

¶ 28. In a principal-agent relationship, when an agent suffers damages but was acting within the scope of his or her duty, the agent is entitled to indemnification from the principal. *See* 3 Am. Jur. 2d *Agency* § 243 (2011). The producer's agreement between Progressive and Anson reflects that Anson is entitled to indemnification for damages she suffered as a result of Progressive's negligence:

> [Progressive] will indemnify, defend, and hold [Anson] harmless for and from all liabilities, losses, damages, judgments, actions, and expenses, including reasonable attorney's fees (collectively, "Losses"), that [Anson] sustain[s] due to [Progressive's] negligence, any wrongful acts, errors or omissions on [Progressive's] part, or [Progressive's] failure to comply with the provisions of this Agreement or [Progressive's] Underwriting Requirements.

¶ 29. The election of remedies doctrine does not implicate Anson's contractual right to seek contribution

or indemnification from Progressive. In *Scheideler*, we did not allow General Casualty to seek recovery of the coverage amount from the Smith Agency as General Casualty conceded that coverage was owed to the Scheidelers regardless of the Smith Agency error. *Scheideler*, 206 Wis. 2d at 490. The mistake by the Smith Agency employee was not determinative as to whether the Scheidelers were entitled to coverage from General Casualty. In contrast, Anson is in the business of procuring coverage—not providing it. Anson alleges that it was Progressive's negligence that caused Anson to pay the coverage amount. It is for the jury to determine whether Progressive's negligence caused the $500,000 in damages alleged by Anson.

## CONCLUSION

¶ 30. The judgment and order of the circuit court are reversed. Thorson and Anson's counterclaims against Progressive and Artisan are reinstated. The settlement agreement between Thorson and Anson resolved Thorson's cross-claim solely against Anson. Our instructions on remand are: (1) Thorson will not be entitled to seek $500,000 of "coverage" from Progressive, but will be able to seek extra-contractual damages from Progressive, and (2) Anson is entitled to seek indemnification from Progressive.

*By the Court*.—Judgment and order reversed and cause remanded with directions.